# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**

* * * * * * * * * * * * * * * * * * *
| | | |
|---|---|---|
| RAE JEAN LEONARD, | * | |
| | * | No. 18-1495V |
| Petitioner, | * | Special Master Christian J. Moran |
| | * | |
| v. | * | Filed: May 27, 2021 |
| | * | |
| SECRETARY OF HEALTH | * | Attorneys' fees and costs, |
| AND HUMAN SERVICES, | * | reasonable basis |
| | * | |
| Respondent. | * | |

* * * * * * * * * * * * * * * * * * *

Bridget C. McCullough, Muller Brazil, LLP, Dresher, PA, for petitioner;
Heather L. Pearlman, United States Dep't of Justice, Washington, DC, for respondent.

**PUBLISHED DECISION DENYING ATTORNEYS' FEES AND COSTS[1]**

Rae Jean Leonard alleged that an influenza vaccination she received on November 25, 2015, caused her to develop Guillain-Barré syndrome ("GBS"). Pet., filed Sept. 27, 2018, Preamble. However, she could not obtain support from an expert and filed a motion to dismiss her case. Entitlement Decision, 2019 WL 6999788, issued Nov. 19, 2019.

Ms. Leonard requested an award for attorneys' fees and costs, asserting that the claim in her petition was supported by good faith and reasonable basis. The Secretary opposed this motion. For the reasons explained below, Ms. Leonard has not presented sufficient grounds for finding she had a reasonable basis for her claim in two respects. First, medical records indicate that Ms. Leonard was having neurologic problems before she received the allegedly causal vaccination. Second,

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this decision on its website. Anyone will be able to access this decision via the internet (https://www.uscfc.uscourts.gov/aggregator/sources/7). Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website

the composite medical records cast considerable doubt on the assertion that Ms. Leonard had Guillain-Barré syndrome at any time.

## Summary of Medical History

The parties' briefs regarding reasonable basis identify some medical records. The critical medical records concern the development of neurologic problems in Ms. Leonard.

### Medical Records through the Date of Vaccination

Ms. Leonard was born in 1971. In 2014, she suffered an arterial ischemic stroke. Exhibit 10 (petitioner's affidavit) ¶ 3; exhibit 2 at 112. The stroke caused Ms. Leonard to lose part of her vision in both eyes. Due to this impairment, Ms. Leonard sought benefits from the Social Security Administration. Exhibit 11 at 140-47 (functional loss statement, dated July 2, 2014).[2]

On March 24, 2015, Ms. Leonard informed her hematologist-oncologist (Magdy Elsawy) that she was having "facial flushing usually in the afternoon," which she described as a "'pins and needles' sensation." Exhibit 2 at 56. The physical exam was normal. Id. at 58. Likewise, before Ms. Leonard had an MRI in February 2017, she reported that she was having "numbness and tingling starting top of iliac crest [with] symptoms x 2 years." Exhibit 5.1 at 158.

Ms. Leonard again reported "a numb and tingly feeling around her mouth" to Dr. Elsawy on June 16, 2015. This was happening "at least once per day." Exhibit 2 at 50.

Ms. Leonard saw a different hematologist-oncologist, Abdelaziz El Haddad, on October 6, 2015. Ms. Leonard reported she "gets some tingling [in] her left hand and foot." She also stated she had "numbness and tingling around her mouth." Exhibit 2 at 43. Dr. El Haddad's exam revealed "Normal muscle strength and tone in the upper and lower extremities." Id. at 45.

---

[2] Later, in conjunction with a hearing before an administrative law judge, Ms. Leonard amended her date of onset to December 18, 2015, when she maintained that she started to experience numbness and tingling. Exhibit 11 at 707, 717. The administrative law judge awarded her benefits. Id. at 720 (Jan. 24, 2017).

Ms. Leonard provided a relatively similar history to a nurse practitioner in a neurology clinic, Meghan Kinnetz, a few months later on December 18, 2015. Ms. Leonard stated that after an episode of great toe pain in July, "she developed a 'pins and needles' feeling from that area that has slowly progressed circumferentially up her leg to the mid calf area." Exhibit 3 at 42 (Dec. 18, 2015).

The date Ms. Leonard received the allegedly causal flu vaccine was November 25, 2015. On this date, she saw her primary doctor, Michael Blaess. Exhibit 11 at 534.[3] The chief complaint for this visit was "tingling and numbness" in both feet, continued "tingling around mouth and now tingly around [both] eyes." She reported "'not being able to feel water temperature' on [both] feet in shower." Id. at 530. On a diabetic foot exam, one toe in each foot had diminished tactile sensations. Id. at 533. Dr. Blaess recommended that she follow up with neurology, possibly for an EMG and/or nerve conduction study. Id. at 534.

Events after the Vaccination

The first post-vaccination medical appointment was on December 3, 2015. Ms. Leonard told her hematologist-oncologist that she was having "shooting pain bilateral feet at night, numbness and tingling. [She also] [h]as facial numbness." Exhibit 2 at 38. She also stated that she was seeing Dr. Jacoby "this month." Id.

Ms. Leonard went to Dr. Jacoby's office on December 18, 2015, during which Ms. Leonard told nurse practitioner Kinnetz that she had been experiencing pins and needles in her calf since approximately July. Exhibit 3 at 42. Ms. Leonard added that "About three weeks ago she developed similar paresthesias in her right foot that is now extending to her ankle." Id. Finally, Ms. Leonard also indicated that "she has noticed perioral tingling sensation. This has been constant and is very bothersome. It is now extending up into her face and under her eyes." Id.

On exam, Ms. Kinnetz detected "Decreased sensation to left lower extremity in stocking distribution to light touch and temperature change." Id. at 44. Ms. Kinnetz diagnosed Ms. Leonard as suffering from "paresthesias- present since

---

[3] Exhibit 11 consists of records Ms. Leonard obtained from the Social Security Administration, which awarded her disability benefits. Dr. Blaess's November 25, 2015 medical record is not contained in the set of records from the practice where he works. See exhibit 4. The Secretary indicated that "the omission was not intentional." Resp's Resp., filed May 5, 2020, at 2 n.1.

3

July" and ordered an MRI. This MRI was unchanged from MRIs obtained during her stroke. Id. at 37 (Dr. Jacoby's Jan. 20, 2016 report).

Ms. Leonard underwent electrodiagnostic testing (nerve conduction study and EMG) with Dr. Jacoby on December 29, 2015. He interpreted the test results as suggesting "a possible peripheral polyneuropathy." Exhibit 3 at 100-01.

Complaining of weakness, numbness and feeling cold for two months, Ms. Leonard went to Mercy Medical Center, where she was admitted, on February 19, 2016. Ms. Leonard said that "all symptoms started after Christmas." Exhibit 11 at 628. Ms. Leonard also reported that earlier in the week, she had nausea/vomiting with dehydration. In the hospital, she received liters of saline and she ate a "decent dinner." Afterwards, she felt better and was discharged with instructions to see her neurologist, Dr. Jacoby. Id.

The neurology records memorialize a series of telephone calls between an assistant to Dr. Jacoby and Ms. Leonard. Ms. Leonard informed the neurology office that she had been in the hospital, was seeking follow-up testing, and had an appointment with her primary care doctor. In the course of these calls, Ms. Leonard "wanted to bring to [Dr. Jacoby's] attention that she had gotten her flu vaccine 3 days before the symptoms started coming on and wonders if it [is] possible that there is a correlation between the 2?" Exhibit 3 at 35. The response from the assistant was: Ms. Leonard "will address with her PCP when they call her about her lab results. I asked that she keep us posted on whether issue caused from vaccine or not." Id.

The in-person visit with Dr. Jacoby happened on April 11, 2016. Exhibit 3 at 29. Ms. Leonard gave a history in which she has noticed "tingling sensation in face, feet feel cold and hurt." She has "[t]ingling from waist down, worse from knees down." "History of symptoms starting in the left foot in July 2015 and then noted progression of symptoms in November 2015." Id. Dr. Jacoby detected that some of her reflexes were absent. Id. at 31. His assessment included "peripheral polyneuropathy" and he was also considering "a variant form of CIDP." Id. She then began therapy with IVIG. Id.; see also exhibit 4 at 60 (April 26, 2016 record from Dr. Blaess that she recently began IVIG). More than two years later, a history in the records of a hematologist-oncologist indicates that Ms. Leonard was diagnosed with CIDP in April 2016. Exhibit 11 at 905.

While Dr. Jacoby anticipated that Ms. Leonard might return 6 weeks after his April 11, 2016 report (exhibit 3 at 31), it appears that Ms. Leonard did not. On January 4, 2017, an assistant for Dr. Jacoby communicated that Ms. Leonard "no

4

showed her 05/31/16 appt." Exhibit 3 at 22. Ms. Leonard responded that "she no longer has insurance so she cannot come in." Id. Similarly, Ms. Leonard averred that she was "without health insurance for approximately six (6) to eight (8) months, during which time [she] was unable to be seen by a doctor." Exhibit 10 (damages affidavit) ¶ 10.

The January 4, 2017 communications between Ms. Leonard and Dr. Jacoby's assistant began when Ms. Leonard requested a letter on her diagnosis. "[H]er lawyer is requesting a letter from [Dr. Jacoby] regarding her [diagnosis] of Guillain Barré for her disability. The records they [received] did not mention the [diagnosis] of Guillain Barré." Exhibit 3 at 22.[4] After additional communications, Ms. Leonard scheduled another appointment.

That appointment happened the next day, January 5, 2017. Ms. Leonard stated that she tried IVIG "for 4 days and didn't help. Felt ill during treatments and did not receive the 5th." Exhibit 3 at 19. Ms. Leonard also said that she has "persistent numbness in legs from the knees down as the worst. Balance is a problem. Reports weakness in the legs. . . . Symptoms static since April." Id. After a physical examination, Dr. Jacoby assessed Ms. Leonard as "Historically, diagnosed with ppn [peripheral polyneuropathy]. Tried IVIG in April without benefit for presumptive CIDP." Id. at 21. Dr. Jacoby ordered MRIs and stated that "Disability papers will be completed." Id.

Meanwhile, on January 4, 2017, which was the day Ms. Leonard telephoned Dr. Jacoby's office, Ms. Leonard also saw Dr. Blaess. Exhibit 4 at 64-68. She also told Dr. Blaess that she had been without medical insurance. She was continuing "to have numbness and tingling to the face, hands and arms, legs." Id. at 64. For these problems, Dr. Blaess recommended that she follow up with neurology. As explained above, Ms. Leonard initiated a communication with Dr. Jacoby's office the same day she saw Dr. Blaess.

---

[4] The lawyer is not identified. The timesheets from Ms. Leonard's current attorney show that Ms. Leonard first communicated with an attorney from the firm that represents her on February 9, 2017. Pet'r's Mot. for Attorneys' Fees and Costs, filed Mar. 21, 2020, exhibit A (timesheets).

Ms. Leonard was also represented by an attorney for her claim for Social Security benefits. Exhibit 11 at 609. The context suggests that this attorney may have requested information for the administrative law judge. See id. at 658-60 (submitting Dr. Jacoby's Jan. 6, 2017 letter).

5

Following the appointments in January 2017, Ms. Leonard saw doctors less frequently. See, e.g. exhibit 2 at 7-14 (appointments with hematologist-oncologist), exhibit 3 at 1-14 (appointments with neurologist), exhibit 4 at 69-78 (appointments with primary care doctor). However, these records do not meaningfully contribute to the evaluation of reasonable basis.

Based upon an August 7, 2017 recommendation from Dr. Blaess (exhibit 4 at 69-73), Ms. Leonard consulted a neurologist at the University of Iowa, Christopher Nance, on October 19, 2017. A key portion is the history that Dr. Nance obtained. His report states:

> In 11/2015, she received a flu shot and 2 days later started to develop paresthesias of her feet and started ascending up her legs. Her symptoms peaked over 4 weeks and included some weakness of her feet and pain in her feet. She also had some paresthesias of her hands and some problem with performing fine motor skills. She also had significant difficulty ambulating and face numbness. She did not receive extensive work-up and was not treated with IVIG.

Exhibit 6 at 11. For current symptoms, Dr. Nance stated that Ms. Leonard reports "weakness in her feet, imbalance, paresthesias/pain in her feet but denies bowel/bladder symptoms, diplopia or dysphagia." Id. Dr. Nance conducted a physical examination. He assessed her as suffering a peripheral neuropathy. Dr. Nance added that Ms. Leonard's "clinical presentation is suggestive of AIDP rather than CIDP but we will repeat an EMG." Id. at 15. Dr. Nance's ensuing EMG, which was performed on November 15, 2017, showed "mild" electrophysiologic findings. "There is no evidence for a demyelinating neuropathy." Id. at 27.

Again, a period passes during which Ms. Leonard saw relatively few doctors. See exhibit 2 at 1-6 (hematologist-oncologist). During this time, Ms. Leonard did not return to Dr. Jacoby, her usual neurologist. On March 23, 2018, Ms. Leonard saw her primary care doctor. Dr. Blaess reported that he reviewed her evaluation from the University of Iowa. "I do suggest that she has acute inflammatory demyelinating polyneuropathy suspected from Guillain Barré syndrome. Several lab tests and EMG tests were completed. I do not have records of these results yet." Exhibit 4 at 83.

6

Just four days later, Ms. Leonard consulted Dr. Sabrina Taylor when Ms. Leonard was experiencing high blood pressure and could not see her primary care doctor. Exhibit 11 at 795 (March 27, 2018). Ms. Leonard was interested in establishing care with Dr. Taylor at the Mercy East Family Practice. Dr. Taylor's office notes emphasize Ms. Leonard's acute problem of high blood pressure and recommended that Ms. Leonard return for follow up.

This return appointment occurred on April 12, 2018, during which Ms. Leonard also reported "lower extremity weakness after GBS." Exhibit 11 at 792 (history of present illness). Dr. Taylor documented a loss of strength on her review of systems. Dr. Taylor referred her to physical therapy.

On October 5, 2018, Ms. Leonard again saw Dr. Taylor at the Mercy East Family Practice for a check of her thyroid and hypertension. Exhibit 11 at 783. During this appointment, Ms. Leonard declined an annual flu vaccination due to her history of GBS. Id. at 786.

The State of Iowa's disability determination section arranged for physician's assistant (certified) to evaluate Ms. Leonard on February 20, 2019. At this appointment, Roberta Baldus noted Ms. Leonard's history of Guillain-Barré syndrome. Exhibit at 861-67. Ms. Baldus attributed several restrictions in activities, such as stooping, bending, and crawling due to the Guillain-Barré syndrome. Id.

**Procedural History**

Through counsel, Ms. Leonard filed her petition on September 27, 2018, along with nine exhibits. Ms. Leonard alleged the November 25, 2015 flu vaccination caused her to suffer Guillain-Barré syndrome. Ms. Leonard claimed compensation via the Vaccine Injury Table. Pet., preamble. Ms. Leonard's recitation of facts about her claim began with the November 25, 2015 vaccination. See Pet. ¶ 2. Ms. Leonard's petition omitted any discussion of medical records before November 25, 2015.

To advance her claim, Ms. Leonard was directed to identify places in the medical records in which a doctor associated Ms. Leonard's neurologic problem with a vaccination. Order, issued March 8, 2019. In response, Ms. Leonard stated that she "was unable to find any statements where the vaccination was directly linked to her injuries." Pet'r's Status Rep., filed April 25, 2015. However, she listed one place in which "flu" is listed as an allergy and she identified excerpts from Dr. Nance's October 19, 2017 report.

7

During a May 30, 2019 status conference, Ms. Leonard offered to obtain an expert report to assist with clarifying her diagnosis. See orders, issued June 4, 2019; June 21, 2019. Ms. Leonard filed a statement from Dr. Nance, who examined her. Exhibit 13. Ms. Leonard also filed a statement from Dr. Taylor. Exhibit 12.

After Ms. Leonard could not secure a report from an expert, Ms. Leonard filed a motion to dismiss her petition on November 2, 2019. Her case was dismissed. Entitlement Decision, 2019 WL 6999788, issued Nov. 19, 2019.

Ms. Leonard requested attorneys' fees and costs. Pet'r's Mot., filed March 21, 2020. Adjudication of Ms. Leonard's motion was deferred while the Federal Circuit considered the factors contributing to an analysis of reasonable basis. The Federal Circuit provided additional guidance in Cottingham v. Sec'y of Health & Human Servs., 971 F.3d 1337 (Fed. Cir. 2020). The parties reiterated their positions in additional briefs filed after Cottingham.

After the issuance of the Federal Circuit's decision in James-Cornelius v. Secretary of Health & Human Services, the parties were subsequently provided with an additional opportunity to submit supplemental briefs on the issue of reasonable basis in light of the developments from this case. 984 F.3d 1374 (Fed. Cir. 2021). Ms. Leonard filed her supplemental brief on March 23, 2021, and the Secretary filed his response on April 5, 2021. In her brief, Ms. Leonard emphasized the point from James-Cornelius that a formal medical opinion is not required to establish reasonable basis, as well as the points that medical records constitute evidence that can be provided to support causation for the reasonable basis determination. Pet'r's Suppl. Br., filed Mar. 23, 2021, at 3-5. The Secretary in response stated that, while affidavits and medical records can constitute evidence supporting reasonable basis, the evidence on which Ms. Leonard relies does not support a finding of reasonable basis in this case. Resp't's Suppl. Br., filed April 5, 2021.

The motion is ready for adjudication.

### Standards for Adjudication

Petitioners who have not been awarded compensation are eligible for an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim." 42 U.S.C. § 300aa—15(e)(1). As the Federal Circuit has stated, "good faith" and "reasonable basis" are two separate elements that must be met for a petitioner to be eligible for attorneys' fees and

8

costs. Simmons v. Sec'y of Health & Human Servs., 875 F.3d 632, 635 (Fed. Cir. 2017).

"Good faith" is a subjective standard. Id.; Hamrick v. Sec'y of Health & Human Servs., No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she honestly believes that a vaccine injury occurred. Turner v. Sec'y of Health & Human Servs., No. 99-544V, 2007 WL 4410030, at * 5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). The Secretary has not challenged petitioner's good faith here and the undersigned finds the Secretary's position that good faith exists to be reasonable. Accordingly, Ms. Leonard's eligibility for attorneys' fees and costs turns on the question of the reasonable basis for the petition.

Reasonable basis is purely an evaluation of the objective weight of the evidence. Simmons, 875 F.3d at 636. Because evidence is "objective," the Federal Circuit's description is consistent with viewing the reasonable basis standard as creating a test that petitioners meet by submitting evidence. See Chuisano v. Sec'y of Health & Human Servs., No. 07-452V, 2013 WL 6234660, at *12-13 (Fed. Cl. Spec. Mstr. Oct. 25, 2013) (explaining that reasonable basis is met with evidence), mot. for rev. denied, 116 Fed. Cl. 276 (2014).

In practice, it has proven difficult to define the scintilla of evidence that carries petitioner's burden regarding reasonable basis. When the Federal Circuit and judges of the Court of Federal Claims have commented on the reasonable basis standard, they often do not speak of the amount of evidence that confers reasonable basis. Instead, they have sometimes spoken to the types of situations where reasonable basis cannot be said to exist. For example, a petition based purely on "unsupported speculation," even speculation by a medical expert, is not sufficient to find a reasonable basis. Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994) ("Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorney fees and costs by merely having an expert state an unsupported opinion that the vaccine was the cause in-fact of the injury"). As another example, when "the medical and other written records contradict the claims brought forth in the petition," a special master is not arbitrary in concluding that reasonable basis for the petition did not exist. Murphy v. Sec'y of Health & Human Servs., 30 Fed. Cl. 60, 62 (1993), aff'd without op., 48 F.3d 1236 (Fed. Cir. 1995) (table).

In Simmons, a judge found petitioner's failure to submit a petition that complied with the Vaccine Act's requirements supported a finding that reasonable basis for the petition did not exist. The judge reasoned that section 11(c) of the

9

Vaccine Act requires that petitions "be accompanied with evidence of injury" [to] ensure[] that petitioners and their counsel make some effort to establish that there was a vaccination and an injury that may be linked to the vaccine." Simmons v. Sec'y of Health & Human Servs., 128 Fed. Cl. 579, 583 (2016), aff'd, 875 F.3d 632 (Fed. Cir. 2017).

While those older cases presented examples in which petitioners were found not to have satisfied the reasonable basis standard, two more recent cases are examples in which petitioners might have satisfied the reasonable basis standard. The Federal Circuit clarified the reasonable basis standard, specifically materials that constitute objective evidence, in Cottingham v. Secretary of Health & Human Services, stating that "failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion." 971 F.3d 1337, 1345 (Fed. Cir. 2020). Furthermore, in categorizing medical records as objective evidence, the Federal Circuit stated, "[m]edical records can support causation even where the records provide only circumstantial evidence of causation." Id. at 1346. The Federal Circuit in Cottingham specified that "[w]e make no determination on the weight of the objective evidence in the record or whether that evidence establishes reasonable basis, for these are factual findings for the Special Master and not this court." Id. at 1347.

Finally, in its most recent opinion regarding the reasonable basis standard, the Federal Circuit stated that medical records may constitute objective evidence to support reasonable basis. James-Cornelius v. Sec'y of Health & Human Servs., 984 F.3d 1374, 1379-81 (Fed. Cir. 2021). The Federal Circuit clarified that "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has reasonable basis." Id. at 1379 (citing Cottingham, 971 F.3d at 1346). James-Cornelius also stated that affidavits and sworn testimony can contribute to the analysis of reasonable basis when the person is competent to provide the testimony. These two most recent decisions (Cottingham and James-Cornelius) guide the analysis regarding what types of evidence constitute objective evidence of reasonable basis, as originally articulated in Simmons, though the ultimate weighing of such evidence is left up to the special master.

**Analysis**

The Vaccine Act links a finding of reasonable basis to "the claim for which the petition was brought." 42 U.S.C. § 300aa–15(e). Thus, reiterating the claim in the petition starts the evaluation.

10

Here, Ms. Leonard alleged that following her November 25, 2015 flu vaccination, she developed Guillain-Barré syndrome within the time allowed in the Vaccine Injury Table. Pet. (Because the Vaccine Injury Table associates the flu vaccination with Guillain-Barré syndrome that develops 3-42 days after the vaccination, 42 C.F.R. § 100.3(a) ¶ XIV.D., the operative time is November 28, 2015 through January 6, 2016.)

While Ms. Leonard did not receive compensation, Ms. Leonard maintains that she had a reasonable basis for her petition. As "objective evidence," Ms. Leonard identifies, among other records, the statements from Dr. Taylor and Dr. Nance. Pet'r's Supp'l Mot., filed Apr. 6, 2020, at 9; Pet'r's Supp'l Br., filed Sept. 27, 2020, at 3. In response to the Secretary's argument that Ms. Leonard's neurologic problems existed before the flu vaccination, she relies upon her own affidavit, exhibit 10.

Ms. Leonard's arguments concerning her reasonable basis are not persuasive. The analysis begins with Dr. Taylor.

A review of the records shows that Dr. Taylor treated Ms. Leonard from March 2018 through at least October 2018. Exhibit 11 at 793-905.[5] However, as discussed in more detail below, Dr. Taylor's experience in treating Ms. Leonard in *2018* offers little assistance in understanding the nature of Ms. Leonard's problems following the vaccination in *2015*.

A problem with Ms. Leonard's case stems from the onset of neurologic problems. The Secretary identified medical records that indicate that Ms. Leonard was having numbness or tingling in various parts of her body before she received the flu vaccination on November 25, 2015.

Ms. Leonard attempts to answer this through an affidavit, containing three justifications. First, Ms. Leonard avers that the numbness and tingling around her mouth was due to an infection in her bottom teeth. These teeth were pulled and

---

[5] After Ms. Leonard put forward Dr. Taylor's statement (Pet'r's Supp'l Mot. at 9), the Secretary stated that he could not identify any medical record from her. Resp't's Resp. at 10. Nonetheless, Ms. Leonard again relied upon Dr. Taylor's statement without explaining who Dr. Taylor is. Pet'r's Supp'l Br. at 3. It is not readily apparent why neither petitioner's counsel nor respondent's counsel could present information from exhibit 11, showing Dr. Taylor treated Ms. Leonard.

11

replaced with dentures. Second, the pain in her left toe was due to a wart. Third, pain in her left hand and wrist was due to carpal tunnel syndrome. Exhibit 10 (affidavit, signed Oct. 12, 2018) at ¶ 4.

Ms. Leonard has not supported these averments with citations to medical records. As of February 2, 2017, Ms. Leonard denied having dentures. Exhibit 5.1 at 159. While Ms. Leonard may have obtained dentures after February 2, 2017, Ms. Leonard did not file any dental records. As to a wart, the references to a wart occur in May 2018, more than two years after the vaccination. Exhibit 11 at 787, 790. Given how frequently Ms. Leonard saw doctors, it seems unlikely that she would have delayed pointing out a wart for such a lengthy amount of time. Finally, the undersigned has not located any medical record discussing carpal tunnel syndrome.

The inconsistencies between Ms. Leonard's affidavit and medical records created contemporaneously to events described in paragraph 4 of her affidavit greatly undermine her petition's assertion that she started to experience Guillain-Barré syndrome within 42 days after the November 25, 2015 flu vaccination. But, the larger problem is the lack of diagnosis of Guillain-Barré syndrome in the relevant time.

Guillain-Barré syndrome presents acutely with a decline to nadir within 28 days. 42 C.F.R. § 100.3(c)(15). None of the medical professionals who saw Ms. Leonard in December 2015 to January 2016 diagnosed her with Guillain-Barré syndrome. It seems likely that a doctor would have intervened if Ms. Leonard were suffering from Guillain-Barré syndrome, which can lead to paralysis and death.

When Ms. Leonard's neurologist Dr. Jacoby saw her in April 2016, he did not diagnose Guillain-Barré syndrome. Instead, Dr. Jacoby stated that she might suffer from "a variant form of CIDP." Exhibit 3 at 31. Ms. Leonard has not argued against this diagnosis from a doctor who saw her both before and after the vaccination.

Ms. Leonard relies upon Dr. Nance's October 19, 2017 medical record as well as his July 29, 2019 letter addressed "To Whom It May Concern." In both exhibits, Dr. Nance asserts that the onset of Ms. Leonard's problem began a couple days after the flu shot. Exhibit 6 at 11; exhibit 13. But, Dr. Nance has no direct knowledge of Ms. Leonard's condition in November 2015. He saw her for the first time approximately two years later. Likewise, although in June 2019, Dr. Taylor wrote a letter "To whom it may concern," stating Ms. Leonard "has a history of

Guillain Barré that was suspected to be caused from an influenza vaccine," exhibit 12, Dr. Taylor did not see Ms. Leonard shortly after the flu vaccination.

Despite Dr. Nance's and Dr. Taylor's statuses as treating doctors, their reports are not dispositive. See Dobrydnev v. Sec'y of Health & Human Servs., 566 F. App'x 976, 983 (Fed. Cir. 2014) (noting special master may reject the testimony of a doctor who examined the vaccinee when the doctor receives an inaccurate history); Castaldi v. Sec'y of Health & Human Servs., 119 Fed. Cl. 407, 416 (2014) (determining that special master was not arbitrary in considering that the reports from a treating doctor "were largely based on [the petitioner's] recollection rather than [the doctor's] own observations"); Balasco v. Sec'y of Health & Human Servs., No. 17-215V, 2020 WL 1240917, at *21 (Fed. Cl. Spec. Mstr. Feb. 14, 2020) (rejecting statements from treating doctors about diagnosis when the treaters relied upon history that was not correct).

In addition, in his October 19, 2017 medical record, Dr. Nance noted that Ms. Leonard could suffer from acute inflammatory demyelinating polyneuropathy (a term encompassing Guillain-Barré syndrome). Exhibit 6 at 15. But, when Dr. Nance tested Ms. Leonard he found "no evidence for a demyelinating polyneuropathy." Id. at 27. The lack of demyelination makes Guillain-Barré syndrome unlikely. See 42 C.F.R. § 100.3(c)(15) (stating that more than 90 percent of Guillain-Barré syndrome cases in North America are "demyelinating"). The objective testing inconsistent with a diagnosis of Guillain-Barré syndrome weighs strongly against reasonable basis.

A finding that Ms. Leonard's case lacked a reasonable basis is consistent with an appellate authority with somewhat similar facts. See Murphy v. Sec'y of Health & Human Servs., No. 90-882V, 1991 WL 74931 (Cl. Ct. Spec. Mstr. Apr. 25, 1991). Today, Murphy is often cited as a well-known case in which a special master weighed the value of medical records created contemporaneously with the events the medical records described against the value of affidavits created many years later. The special master found that the medical records were more reliable, id. at *5, and the Claims Court ruled that this finding was not arbitrary. 23 Cl. Ct. 726, 734 (1991), aff'd, 968 F.2d 1226 (Fed. Cir. 1992). Under the representations presented in the contemporaneously created medical records, the petitioners in Murphy were not entitled to compensation.

A less recognized aspect to Murphy is the ensuing motion for attorneys' fees and costs, which is more relevant to the case at hand. Although the special master's 1993 decision denying an award of attorneys' fees and costs is unpublished, the opinion on a motion for review states the special master found a

13

lack of reasonable basis because "the medical records and other written records contradict the claims brought forth in the petition." 30 Fed. Cl. 60, 61 (1993). Upon a motion for review, the petitioners argued that the special master abused his discretion in denying attorneys' fees and costs. More specifically, the petitioners argued that "because they submitted expert opinion to support their claim, they had a reasonable basis for their case as a matter of law." Id. at 62.

The Court, however, rejected the petitioners' argument and ruled that the special master was not arbitrary in finding a lack of reasonable basis. The Court reasoned that an expert report premised on unreliable assertions does not confer reasonable basis:

> [The petitioners'] position assumes that special masters rely upon expert testimony without determining whether it is corroborated by the facts. This position is not plausible, as expert testimony in and of itself does not determine reasonableness. . . . [T]he expert opinion submitted by petitioners was founded upon Mrs. Murphy's version of the events, a version found to be unreliable by the special master.

Id. at 63.

While neither the special master's decision nor the opinion denying the motion for review from the judge of the Court of Federal Claims constitutes binding authority, see Boatmon v. Sec'y of Health & Human Servs., 941 F.3d 1351, 1358 (Fed. Cir. 2019), Murphy does provide some appellate guidance. See Frantz v. Sec'y of Health & Human Servs., 146 Fed. Cl. 137, 143-44 (2019) (ruling that special master was not arbitrary in finding that an expert's report did not justify continuing the litigation); Woods v. Sec'y of Health & Human Servs., 105 Fed. Cl. 148, 153 (2012) (vacating an award of attorneys' fees and costs on an interim basis premised on settlement discussions and remanding for consideration of medical records).

According to Murphy, a discrepancy between medical records created contemporaneously and later-given assertions could, in some cases, weigh against a finding that reasonable basis supported the claim set forth in the petition. This guidance points against a finding of reasonable basis in Ms. Leonard's case.[6]

---

[6] While the outcome in Murphy, a denial of attorneys' fees and costs, is consistent with the outcome in this decision, also a denial of attorneys' fees and costs, Murphy does not require this result. Other special masters might reasonably

14

Moreover, the presence of a report from a doctor, like Dr. Nance and/or Dr. Taylor, does not mandate a finding of reasonable basis. This lesson is demonstrated by the Federal Circuit's earlier precedential opinion on reasonable basis, Perreira v. Secretary of Health & Human Services. In that case, the Federal Circuit held that the Chief Special Master could determine that a petitioner lacked reasonable basis, despite an expert report, because "the expert opinion was grounded in neither medical literature nor studies." Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994). "Perreira demonstrates that special masters enjoy discretion to find that a claim lacked a reasonable basis when the evidence on which the petitioners relies (there, an expert's report) is rooted in unsupported speculation." Ellis v. Sec'y of Health & Human Servs., No. 13-336V, 2019 WL 3315326, at *4 (Fed. Cl. Spec. Mstr. June 24, 2019). The Federal Circuit provided the "reasonable basis" standard with some teeth in Perreira, by declaring: "Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorneys' fees and costs by merely having an expert state an unsupported opinion." 33 F.3d at 1377. Here, Dr. Nance's suggestion that Ms. Leonard might suffer from acute inflammatory demyelinating polyneuropathy came before he conducted the EMG, which found no evidence of demyelination. Exhibit 6 at 27.

In sum, the claim set forth in Ms. Leonard's petition lacked reasonable basis in two respects. First, the assertion that Ms. Leonard suffered from Guillain-Barré syndrome is inconsistent with the bulk of medical records created by doctors who treated her. Second, the assertion that Ms. Leonard's Guillain-Barré syndrome began shortly after her vaccination is belied by medical records in which Ms. Leonard says problems like numbness and tingling started before the vaccination. Although Ms. Leonard's burden on both points is presenting evidence below the preponderance of the evidence standard, Ms. Leonard still is burdened to present "objective evidence" on these points. The grounds that Ms. Leonard has identified do not fulfill her burden.

---

reach different conclusions, especially when the nature of the inconsistency between versions of events differs. Cf. SiOnyx LLC v. Hamamatsu Photonics K.K., 981 F.3d 1339, 1355 (Fed. Cir. 2020) (indicating that while a district court "may have been within its right" to award attorneys' fees pursuant to 35 U.S.C. § 285, the denial of fees was not an abuse of discretion).

## Conclusion

Ms. Leonard's March 21, 2020 motion for attorneys' fees and costs is premised upon a finding that the claim in her petition was supported by reasonable basis. However, Ms. Leonard has not made this predicate showing. Accordingly, the motion for attorneys' fees and costs is DENIED. The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed.

**IT IS SO ORDERED.**

s/Christian J. Moran  
Christian J. Moran  
Special Master